NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-3234

DON JUAN GRAHAM,

Petitioner,

v.

COMMODITY FUTURES TRADING COMMISSION,

Respondent.

Don Juan Graham, of Washington, DC, pro se.

Lauren S. Moore, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for respondent.  With her on the brief were Michael F. Hertz, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Brian M. Simkin, Assistant Director.

Appealed from:  Merit Systems Protection Board

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-3234

DON JUAN GRAHAM,

Petitioner,

v.

COMMODITY FUTURES TRADING COMMISSION,

Respondent.

Petition for review of the Merit Systems Protection Board in DC0752060238-I-2.

_____

DECIDED: October 8, 2009

_____

Before MICHEL, Chief Judge, NEWMAN, and DYK Circuit Judges.

NEWMAN, Circuit Judge.

Don Juan Graham, pro se, appeals the decision of the Merit Systems Protection Board affirming his removal from a position with the Commodity Futures Trading Commission. Graham v. Commodity Futures Trading Comm'n, 2007 M.S.P.R. 100 (2007). We affirm.

## BACKGROUND

Mr. Graham was employed at the Commodity Futures Trading Commission ("CFTC") in Washington, D.C. from 1994 until his removal on January 18, 2006. During the period of this employment he served in the United States Army Reserves, and was periodically called to active duty. On August 5, 2004, when he held the position of

Support Services Assistant, CT-05, in the CFTC's Office of Management Operations, he was ordered to report for duty at Fort Bragg the next day, August 6, 2004. The CFTC placed Mr. Graham on leave without pay. Mr. Graham served in Afghanistan, returned from active duty on August 12, 2005, and returned to his position at the CFTC on September 6, 2005. During the week that followed, the CFTC states that Mr. Graham engaged in various acts of misconduct.

In a Notice of Proposed Removal dated November 30, 2005, Mr. Graham's supervisor, Tamrah A. Semega, described the history of Mr. Graham's employment at the CFTC, including his disciplinary history, and stated that removal was proposed in view of present and past misconduct. The Notice stated that Mr. Graham had been placed on a Performance Improvement Plan ("PIP") in February 2000, after his performance review showed deteriorating performance during the 1999-2000 rating period. The Notice stated that during that prior period Mr. Graham did not complete certain tasks in a timely manner, did not update contact information provided to customers who called the agency with complaints, and did not respond to a request for a status report. Mr. Graham's performance was rated successful during the 2002 PIP. However the Notice of Proposed Removal stated that in June and July of 2004 he was counseled by his new supervisor, Ms. Deedra Jones, several times about misconduct, including several incidents of rude and disrespectful conduct and failure to follow instructions. The Notice stated that on July 6, 2004 Mr. Graham received a letter of reprimand, which described several incidents and advised Mr. Graham that his conduct was impeding the ability of his division to carry out its mission, warning that further misconduct could result in more severe disciplinary action, up to and including removal

from federal service. The Notice stated that "Ms. Jones also advised you that if you were experiencing a health or personal problem that you felt may be contributing to your misconduct, you could contact an Employee Assistance Program (EAP) counselor to seek advice or assistance." The Notice further stated that after the letter of reprimand, Mr. Graham's conduct failed to improve, including after July 15, 2004 when a new supervisor, Ms. Candace Turner, took charge. The Notice cited several additional incidents of rude and disrespectful conduct and failure to follow instructions that occurred on July 27 and 28, 2004, shortly before Mr. Graham was called to active duty to serve in Afghanistan. The Notice stated that because of this misconduct,

> Ms. Turner had decided to take more severe disciplinary action based on the additional instances of unacceptable conduct. However, after careful consideration, Ms. Turner decided not to take additional disciplinary action because you were scheduled to leave the CFTC to go on active duty with the U.S. Army for one year . . . . Ms. Turner reasoned that since you would be away from the office for one year, taking more severe discipline action before you left the CFTC would not effectively deter your unacceptable conduct. Furthermore, Ms. Turner hoped that being away from the office would provide you the opportunity to reflect and return to work with a fresh outlook.

The Notice of Proposed Removal stated that Mr. Graham, upon his return from service in Afghanistan, immediately engaged in similar unacceptable conduct. The Notice identified four classes of misconduct during this period that were said to justifiy Mr. Graham's removal in light of his disciplinary history: First, Ms. Semega cited four instances of rude and disrespectful conduct, that occurred (1) on September 8, 2005 at a staff meeting; (2) on September 12, 2005 in a confrontation with another employee involving Mr. Graham's failure to perform an assignment properly; (3) on September 14, 2005 when Mr. Graham refused to open and distribute mail; and (4) on September 14, 2005, when Mr. Graham failed to perform properly the assignment of posting a "Tip-of-

the-Month" document. Of the last instance, the Notice stated that after Mr. Graham's co-worker notified him of his error:

> You became agitated; tensed up your shoulders and started waving your arms; then you lunged forth from your chair, sat down forcefully, and pushed your seat back. At this point you started to shake and stared at [the co-worker] in a hostile manner. In a disgusted and hostile tone, you yelled, "What is it? What do you want?" You turned away from [the co-worker], faced your computer, muttered to yourself and proceeded to ignore [the other employee].

The Notice stated that as a result of the incident, his co-worker was reduced to tears and immediately contacted Ms. Semega. Thereafter, the Notice stated that Mr. Graham left the office for three-and-a-half hours without notifying anyone, and upon his return informed Ms. Semega that he was "at [his] breaking point" and "needed to leave or have time off because [he] was about to explode, and that [he] did not know what [he] was capable of doing."

Second, Ms. Semega charged Mr. Graham with six instances of failure to follow instructions, stating that he (1) failed to meet with her as ordered; (2) failed to initial and return instructions after performing tasks, as had been ordered; (3) left the office for three-and-a-half hours after the aforementioned confrontation with a co-worker on September 14, 2005 without notifying a staff member as he had been instructed; (4) failed to follow instructions on how to perform a routine office task; (5) failed properly to perform the task of registering an employee for the fitness center; and (6) failed to provide his current contact information as he was ordered to do on September 14, 2005.

Third, Ms. Semega charged Mr. Graham with three instances of failure to complete work assignments, including (1) failure to complete a telephone tree; (2) failure to prepare an Excel spreadsheet; and (3) failure on September 14, 2005 to

2007-3234                                4

distribute the "Tip-of-the-Month" document in the requested locations. Fourth, Ms. Semega charged Mr. Graham with being absent without leave (AWOL) from September 19 to 28, 2005 after she placed him on administrative leave on September 14, because he did not provide her with his current contact information, as she had ordered him to do as a condition precedent to leave.

The Notice of Proposed Removal concluded with a Summary, which stated that on several occasions, including in letters dated September 16, 2005 and September 27, 2005, the CFTC provided Mr. Graham with "information regarding the EAP, and encouraged [him] to use the services of the EAP, to assist [him] with any family, personal or work-related problems that [he] might have." The Notice also cited various efforts Mr. Graham's supervisors had made to counsel him regarding his unacceptable conduct, noting that these efforts had proved unsuccessful, and that Mr. Graham's conduct had been disruptive to the efficient operations of the office and damaging to the working relationships of office staff. The Notice stated that in proposing removal rather than a lesser penalty, Ms. Semega considered the entire poor pattern of performance shown by Mr. Graham since 1999.

The Notice informed Mr. Graham of his right to reply either orally or in writing, and the agency extended the time for Mr. Graham to respond. He did not respond, either orally or in writing. The agency removed Mr. Graham from his position effective January 18, 2006.

Mr. Graham subsequently filed a complaint with the Department of Labor (DOL), stating that his removal violated the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§4301-4333. Mr. Graham

also filed an appeal with the Merit Systems Protection Board, stating that he wished to overturn his AWOL status and his removal, and that his removal was improper because it was "based largely on things that occurred from 1999-2000." The Board's administrative judge (AJ) initially dismissed the appeal without prejudice, to allow the DOL time to consider Mr. Graham's complaint; the order of dismissal stated that the Board would refile the appeal if Mr. Graham had not done so after 60 days. Consistent with that statement, the AJ refiled Mr. Graham's appeal on June 14, 2006, although there had not yet been a decision by the DOL.

The AJ then held a one-day hearing to consider Mr. Graham's appeal, including his USERRA claim, and issued an initial decision on August 31, 2006 sustaining all of the charges against Mr. Graham and denying his USERRA defense. Graham v. CFTC, No. DC-0752-06-0238-I-2 (M.S.P.B. Aug. 31, 2006) ("Initial Decision"). The AJ discussed the individual instances of misconduct alleged of each of the four charges. In particular, the AJ discussed the events that occurred on September 14, 2005 at some length. The AJ recounted the Notice of Proposed Removal's description of the incident in which, following his failure to post the "Tip-of-the-Month" document correctly, Mr. Graham had a tense and agitated confrontation with a co-worker. The AJ cited testimony of three witnesses for the agency in support of this charge, noting that their testimony was consistent with the charge as described in the Notice. The AJ also stated that "[f]or his part, the appellant denies that this confrontation took place. He claims that at all times during his conversation with [the co-worker], he was calm and respectful." Initial Decision at 7. The AJ noted this "fundamental disagreement between the appellant and the agency witnesses as to what transpired" on September

14, 2005, and made credibility determinations to resolve the factual dispute. Id. at 7-8. In particular, the AJ concluded that the co-worker to whom Mr. Graham's reaction was directed was a "credible and persuasive witness," and that her testimony was confirmed by the other agency witnesses and documentary evidence, whereas Mr. Graham's account "lack[ed] documentary support or any other corroboration" and was incompatible with the fact that he left the workplace for several hours after the incident. Id. at 8. The AJ similarly rejected Mr. Graham's explanations for the other charges of misconduct.

The AJ also ruled that Mr. Graham had failed to prove that the CFTC had violated USERRA, and had failed to establish that his removal had any connection to his recent military service. In this regard, the AJ stated:

> [T]he record contains no evidence of, and the appellant has failed to identify, any statements or actions or anything at all that reflected a negative attitude on the part of any agency personnel directed toward his service in the military or toward anyone who served in the military. And, the appellant has presented no other evidence whatsoever that demonstrates that he was treated differently because of his participation in the military. Rather, the appellant's theory of USERRA discrimination is based on his assumption that because he served the military and was removed, his participation in the military must have been the motivation. The appellant's theory is totally uncorroborated and I find it falls far short of establishing that the appellant's service in the military was a substantial or motivating factor in the agency's action removing him for his misconduct.

Id. at 19-20. The AJ stated that the agency had presented evidence that it "was in the process of proposing the appellant's suspension for similar misconduct when his unit was called up to service," and that the only reason it had not suspended him at that earlier time was "a hope that time in the military might 'turn him around' and correct his behavior and attitude." Id. at 20.

The AJ also ruled in the alternative that "even if the appellant had shown that his military service had played any role in his removal, the agency has presented more than preponderant evidence that it would have removed him. In addition, I find that the agency presented evidence that the appellant's employment was extended by his military service and not abridged by it." Id. The AJ stated that the agency's decision to remove him was "totally unrelated to his military service," id., and accordingly rejected Mr. Graham's USERRA defense.

As to the penalty, the AJ determined that removal was within the bounds of reasonableness for the sustained charges and promoted the efficiency of the service. The AJ noted that the deciding official had testified that removal was warranted because of the serious nature of the charges, including the disruptions to the office that resulted from the misconduct. The AJ also cited the deciding official's testimony that although the incidents all took place within a seven-day period after his return from service, the behavior was "so continual, disruptive and intense, and so like what his behavior had been before his year in the military, that a week was sufficient for [the deciding official] to realize that the appellant should be removed." Id. at 22. The AJ stated that the deciding official had been "thorough in her evaluation of relevant factors" outlined in Douglas v. Veterans Admin., 5 M.S.P.R. 280 (1981), and the AJ affirmed that removal was appropriate under the circumstances presented. Initial Decision at 23.

Mr. Graham petitioned for review by the full Board. The Board concentrated on the procedural aspects of the copending DOL appeal. The Board observed that although an employee may file a USERRA complaint directly with the Board without first filing a complaint with the DOL pursuant to 38 U.S.C. §4324(b)(1), when the employee

does file a USERRA complaint with the DOL, he must exhaust that procedure before appealing the USERRA issue to the Board. 38 U.S.C. §4324(b); see Milner v. Dep't of Justice, 77 M.S.P.R. 37, 47 (1997). Exhaustion is achieved upon notification from the DOL that the Secretary's efforts did not resolve the complaint. See §4324(b)(2). The Board found that Mr. Graham received such notification from the DOL on November 3, 2006, after the AJ had reinstated Mr. Graham's appeal and after the AJ had rendered the initial decision on August 31, 2006. The Board ruled that although the MSPB did not have jurisdiction over Mr. Graham's USERRA defense at the time of the AJ's initial decision, it acquired jurisdiction at the time of DOL's notification on November 3, 2006. The Board found that Mr. Graham had had a full and fair opportunity to present his USERRA defense to the AJ, and concluded that the procedural error was harmless. The Board concluded that Mr. Graham had shown no error in the AJ's analysis of his USERRA defense and that he had failed to establish a basis to reverse or modify the AJ's findings with respect to any other issue on appeal. The Board accordingly adopted the findings in the AJ's initial decision regarding the USERRA defense, affirmed the initial decision, and sustained Mr. Graham's removal. This appeal followed.

## DISCUSSION

The Board's decision is reviewed on the standard of whether it was "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. §7703(c); see Kochanny v. Bureau of Alcohol, Tobacco, & Firearms, 694 F.2d 698, 700 n.3 (Fed. Cir. 1982).

Mr. Graham argues that the Board incorrectly found facts and ignored important aspects relevant to his return to the CFTC after service in Afghanistan. He argues that the responsibilities assigned to him were not appropriate to his experience and prior federal service, that the workload imposed upon him was too great, that he never failed to complete any tasks for his direct supervisor, Ms. Semega, and that the charges relating to other work assignments came from persons not in his direct chain of command. He states that he was given very little time upon his return from a combat theater to "decompress before I was immediately swamped with numerous assignments" and that he was "dealing with Post Traumatic Stress from my experience from tour of duty in Afghanistan." Pet'r Br. ¶4. In a supplemental memorandum, Mr. Graham explains how he held a variety of positions within the CFTC between 1994 and his removal in 2006, and he suggests that his various transfers and his ultimate removal were the result of incompetent management at the agency rather than his own conduct.

Concerning the events on September 14, 2005, Mr. Graham states in his brief that upon being told by his co-worker that he performed a task improperly, he "stood up from [his] desk and told her, 'Get away from me,'" and then walked away from his workstation. He states that he "became agitated and spoke loudly" to his co-worker, but he argues that this behavior cannot be characterized as "insubordination" because his co-worker was not in his supervisory hierarchy. We observe that this account conflicts with the AJ's account of Mr. Graham's testimony at his hearing, in which he denied any confrontation with his co-worker on September 14, 2005. Mr. Graham's representations on this appeal do not answer the charge against him, for the charge was rude and disrespectful conduct, not insubordination.

Mr. Graham also argues that the AWOL charge was improper. He states that his contact information had been routinely provided to the Human Resources Department on his return to work, and was readily available during the period of administrative leave that Ms. Semega converted to AWOL.

The government responds that Mr. Graham's arguments relate to factual matters that were fully considered by the Board. For instance, the AJ's initial decision states that Mr. Graham "repeatedly t[ook] the position that he is entitled to more challenging work and that he finds the work assigned to him to be humiliating, custodial in nature and beneath him. In addition, the appellant has shown no understanding that his personal sense of dissatisfaction with his position interferes with his coworkers' need for and right to security and peace in the workplace." Initial Decision at 23. Thus the government contends that Mr. Graham's dissatisfaction with the work assigned to him was fully presented to the Board, and was properly rejected as a defense for his misconduct. See Boyle v. United States, 515 F.2d 1397, 1401-02 (Ct. Cl. 1975) (plaintiffs' failures to perform job duties were not excused by their dissatisfaction with management). The government contends that Mr. Graham has shown no reason to disturb the Board's findings on these issues.

As to the difficulty or amount of work given Mr. Graham upon his return from military service, the government does not dispute that he was given simple office tasks, such as two-hole punching documents, attending meetings, and placing documents on bulletin boards. The government contends that this evidence was carefully considered by the Board, and that substantial evidence supports the Board's rejection of Mr. Graham's explanation for why he failed to perform certain of these tasks. The

government points out that Mr. Graham's removal was based not only on his failure to perform certain routine tasks, but also on other serious misconduct, including repeated incidents of rude behavior and refusal to follow instructions. Many of these incidents were unrebutted by Mr. Graham before the Board, and are unrebutted on this appeal. We conclude that substantial evidence supports the Board's determinations with respect to these charges.

The government contends that Mr. Graham's arguments with respect to the events on September 14, 2005 similarly provide no basis for disturbing the Board's decision. While Mr. Graham now admits that a confrontation with his co-worker occurred (although he describes the encounter in more subdued terms than did the AJ), the government states that the AJ heard testimony from both sides concerning this incident, including Mr. Graham's denial that the incident occurred at all, and made credibility findings to resolve the conflicting stories. Such credibility determinations are within the discretion of the Board and are "virtually unreviewable" on appeal. Clark v. Dep't of the Army, 133 F.3d 1450, 1453 (Fed. Cir. 1998). Mr. Graham's current version does not support rejection of the AJ's findings as to this incident.

As to the AWOL charge, Mr. Graham states that he should have been treated as on administrative leave and that he did not provide his current address when he met with his supervisor following the September 14, 2005 confrontation (the basis for treating him as AWOL) because his address was already on file. The government points out that the AJ considered and rejected this argument, finding it was irrelevant that the address could have been discovered on certain documents because Mr. Graham's refusal to provide his address when it was requested constituted a failure to

follow his supervisor's direct instruction.  Reversible error has not been shown in the Board's ruling sustaining the charges stemming from his behavior on September 14, 2005.

Mr. Graham's comment in his appellate brief that he suffered from "Post Traumatic Stress" upon his return from Afghanistan appears to be the first reference to this medical cause or condition.  The AJ did not mention this aspect, and it does not appear to have been presented to the employing agency as an explanation of Mr. Graham's behavior; indeed Mr. Graham did not respond at all to the agency's Notice of Proposed Removal.  Nor does Mr. Graham focus on such a defense on appeal, although he mentions the term "Post Traumatic Stress" in his argument that he was given too much work in too short a period of time upon his return from military service.  The government contends that, even were such an argument entertained for the first time on appeal, it could not provide a basis for disturbing the findings of the Board, particularly in view of Mr. Graham's lengthy history of similar misconduct even preceding his period of service in Afghanistan.

The government points out that Mr. Graham made no allegation to either the CFTC or to the Board that any mental or physical condition caused his recurring rude and disobedient workplace behavior.  The record indicates that Mr. Graham's supervisors advised him to seek counseling through the Employee Assistance Program, both before his term of service in Afghanistan and afterwards.  There is no record support for Mr. Graham's reference on this appeal to "Post Traumatic Stress" at one line of his appellate brief, whereas the agency showed a continuing pattern of workplace

misconduct. On this record, a sufficient predicate has not been established for questioning the factual findings of the Board.

Reversible error has not been shown in the Board's determination that Mr. Graham did not show a connection between his military service and his removal. The Board's conclusion sustaining his removal was supported by substantial evidence, and is affirmed.

No costs.